D. Manson Sutherland, Jr. v. Commissioner. Sutherland Refiner Corporation v. Commissioner.
Sutherland v. Commissioner
Docket Nos. 110350 and 110383.
United States Tax Court
1943 Tax Ct. Memo LEXIS 44; 2 T.C.M. (CCH) 1032; T.C.M. (RIA) 43495; November 30, 1943
*44 James O. Wynn, Esq., and Ellis L. Pierson, Esq., for the petitioners. Jonas M. Smith, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These consolidated proceedings challenge deficiencies in income and excess profits taxes as follows: Income Tax
Year
Deficiency
D. Manson Sutherland
1935
$ 1,800.72
D. Manson Sutherland
1936
16,932.30
Sutherland Refiner Corpora-
tion
1937
24,755.70
Sutherland Refiner Corpora-
tion
1938
2,404.98
Excess Profits Tax
Sutherland Refiner Corpora-
tion
1937
8,003.00
Sutherland Refiner Corpora-
tion
1938
75.73
In addition to challenging the above applicable deficiencies, petitioner Sutherland claims an overpayment of tax for the year 1935 of $913.96 and for the year 1936 of $9,523.54. Some of the issues presented by the deficiency notices and pleadings have been conceded. The effect of these concessions will be reflected in the computation under Rule 50. The remaining issues are (1) whether certain sums received by petitioners under agreements with licensed users of paper pulp refiners constitute taxable income to them in the full amount received, or only in the amount of excess of the *45 cost of manufacturing the machines and (2) whether petitioner corporation, on a cash receipts and disbursements basis of accounting, is chargeable with the sum of $3,753.50 income in the year 1938, in which year it received $11,394 on account under a contract for a machine, and paid over to the company manufacturing the machine $7,640.50 toward the cost of the machine, the balance due on the machine ($11,394) and the balance payable to the machine manufacturing company ($7,640.50) not being paid until after the close of the taxable year. Findings of Fact Petitioner D. Manson Sutherland, Jr., an individual (hereinafter referred to as Sutherland) is a consulting chemical engineer specializing in fibrous materials and for over 20 years has been engaged in that profession and in the development and supply of refiners for the preparation of pulp for paper making. He is president and a stockholder of petitioner, Sutherland Refiner Corporation. Petitioner Sutherland Refiner Corporation (hereinafter referred to as the Corporation) is a New Jersey corporation with its principal office in Trenton, New Jersey. Its business is the development and supply of refiners for the preparation of pulp *46 for paper making. It was formed in October, 1936, and its stock is held by Sutherland and his family. The returns for all periods here involved were filed with the collector of internal revenue for the first district of New Jersey within the time prescribed by law. Since 1929 Sutherland has been conducting experimental work in the refining of pulp and the development of the Sutherland refiner. His ideas have been patented in the United States and Canada. The Sutherland refiner is a machine weighing approximately 11 tons, usually installed in a concrete platform 12 inches above floor level. It is about 4 feet wide, 12 feet long, and about 3 1/2 feet high. In the refiner are 2 discs, one of which rotates, the other being stationary. Pulp, made from wood or grass, in a suspension of approximately 3 1/2 percent is pumped into the refiner and the fibres are forced between the discs. As the fibres pass between the discs they are beaten, bruised and fibrillated. The degree of refining and the type of disc used varies with the type and grade of paper to be made. On leaving the refiner the pulp is further diluted and is placed on a moving screened wire in a paper machine. The moisture in *47 the solution drains through the wire, leaving a long sheet of paper which is dried on steam dryers. The number of refiners necessary for a run of paper varies according to the grade and type of paper to be produced. The only way in which a Sutherland refiner can be adequately tested is in conjunction with a paper machine. In 1930 two experimental refiners were built by and at the expense of the Robinson Manufacturing Company in accordance with a design prepared by Sutherland. At the time Sutherland did not know what type of discs would be needed. He was then using stone discs. One of these machines was shipped to the Mead Corporation at Chillicothe, Ohio (hereinafter referred to as Mead) and was tested for about six months. The stone discs were too pliable and broke, resulting in Sutherland's being asked to discontinue the experiment. The other machine built in 1930 was to be delivered to the Oxford Paper Co. They apparently heard of the poor results at Mead, and delivery was never made. By further experimentation Sutherland thereafter learned the proper type of discs to be used. In 1933 Sutherland approached the Anglo-Canadian Pulp and Paper Mills, Ltd., (hereinafter referred *48 to as Anglocan) with respect to his refining process and the possibilities of profit that lay in them. In 1934 the two machines which had been built in 1930 were sold outright to Anglocan for experimental purposes. Sutherland received $5,500 for the one Mead had used and $12,000 for the other. As a result of these experiments it became apparent that the machine was of great value because it led to operating savings which were considerably above the cost of the machine. On July 15, 1935, Sutherland entered into a contract with Anglocan - the first of four contracts out of which arises the principal issue in these cases. The agreement stated that Sutherland owned certain patents for refining pulp which he wanted to test under commercial or semi-commercial mill operations. By the terms of the contract Sutherland agreed to supply and lease one refiner designed to produce pulp for newsprint. The lease was to run for a period of 12 months from the date of delivery of the refiners to Anglocan and was renewable from year to year. He also agreed to supply such technical assistance as might be required and to advise Anglocan of all improvements in the refining of pulp for newsprint which came *49 to his attention. Paragraph 4 of the agreement was as follows: 4. Anglocan agrees to pay a leasing fee of $10,000.00 for the first twelve months * * * payable as follows: 50% upon the signing of this agreement and the balance upon delivery of the leased refiner to Anglocan. This lease is renewable from year to year and in the event of renewal of the lease Anglocan agrees to pay leasing fees to Sutherland or his nominees on the following scale: 1st year
$10,000.00
2nd to 5th year inclusive
20% net savings
6th to 10th year inclusive
10% net savings
10th year to expiration of
patents
7 1/2% net savings The net savings are to be based on the savings in power consumption on existing grinders now in use by Anglocan. Anglocan agreed to pay the costs of installation, the cost of maintaining the leased refiner, and the costs of tests in their mill. Clause 6 was as follows: 6. Anglocan agrees that at the termination of the lease provided for in Clause 1, or any subsequent extensions thereof, Sutherland may remove the said refiner from Anglocan property without hindrance. Anglocan agreed to confine the use of the refiner to the preparation of pulp for newsprint. Clause 8 was *50 as follows: 8. Anglocan agrees that the leased refiner referred to in Clause 1 shall at all times remain and be the sole and exclusive property of Sutherland and Anglocan shall have no right of property therein, but only the right to use the same subject to the conditions herein contained. The said leased machine shall be used only by Anglocan and only on the premises now occupied by Anglocan in the City of Quebec. The said leased machine shall not be transferred or delivered or sublet to any other person * * *, Sutherland and his agents * * * shall at all times be given access to the leased machine for the purposes of inspecting * * * watching its * * * operation or * * * repairing, improving, or adding to it or determining the nature or extent of its use * * *. The refiner which was leased by this contract has been designated Anglocan Refiner No. 3. It was a new design which had been developed as a result of the preliminary work done with the older machines Sutherland had sold outright to Anglocan. The machine embodied ideas embraced in patents already granted and ideas for which applications for patents were then pending. The language of the contract was the result of negotiations *51 between Sutherland and Anglocan. Before the contract was signed Sutherland told the officers of Anglocan that he did not have sufficient money to finance the construction of the machine. He estimated that the cost would be $10,000, but this was inaccurate as it actually cost $15,000. Sutherland informed Anglocan of this fact in August, 1935. The language of Paragraph 4 quoted above was designed primarily to provide money to pay the builder of the refiner and also to protect Sutherland against claims for refund of the money required to build the refiner and to protect Anglocan against claims Sutherland might make. Sutherland retained title to the machine to enable him to control its technical supervision, its use, and to insure payment. By a contract with Sutherland, John Bertram & Sons of Ontario, Canada, agreed to manufacture the refiners. As a result of the work done by Sutherland with Anglocan, negotions were begun with the Brown Paper Mills Co., Inc., (hereinafter referred to as Brown), manufacturers of Kraft or wrapping paper, who were about to increase their production. On August 30, 1935, Sutherland and Brown entered into a contract similar to the one described above. The *52 contract stated that Brown, after investigating Sutherland's patents and processes, desired to acquire the exclusive right and privilege of using them in its mill. Sutherland thereby granted Brown the exclusive right to use the patented process and any improvements which might be made, for "the period of one (1) year from date of the commencement of actual commercial operations of the refiners to be furnished." This contract provided: Sutherland * * * agrees to furnish * * * two (2) pulp refiners * * * in accordance with Letters Patent and Applications for Letters Patent * * *. Other provisions included: 4. Brown agrees to pay as a leasing fee for the period of this agreement and as a consideration for the other rights and privileges herein granted the sum of thirty thousand ($30,000.00) Dollars payable as follows: fifty per cent (50) upon execution and delivery of this agreement * * * and the balance upon delivery of said * * * refiners. * * * * *
6. Upon termination of this lease and licensing agreement, SUTHERLAND shall remove said refiners from Brown's property at his own cost and expense. * * * * *
8. The refiners to be furnished by SUTHERLAND shall at all times remain *53 the sole and exclusive property of SUTHERLAND and BROWN shall have no right of property therein, but only the right to use same upon the terms and conditions hereof * * * By the agreement Brown was also given the privilege of leasing any additional refiners that it might need. It was also agreed that if additional refiners were leased Sutherland would grant Brown the exclusive right to use his patent for their operations. The machines referred to in this contract were to be built by Wm. R. Thropp & Sons Co. (hereinafter referred to as Thropp). A representative of Brown visited Thropp to see if in his opinion Thropp was capable of building the machines in question and to aid Sutherland in securing credit. Before the contract was entered into Sutherland told Brown that he would need financial assistance for the construction of the machine. He estimated that it would cost $11,490 to construct each machine. On March 11, 1936, one day before the machines referred to in the contract of August 30, 1935, were put in operation, Sutherland entered into another contract with Brown. This contract referred to the option granted Brown in the first contract, whereby Brown could lease such additional *54 refiners as it might need. By this contract Sutherland granted to Brown the exclusive license to use his United States patent relating to pulp refiners and any improvements thereon until they expired. He also agreed to furnish for lease, upon Brown's order, any number of pulp refiners built in accordance with his patent, Brown to pay for each refiner ordered and delivered "the actual cost to Sutherland of building each refiner, plus 20% of the cost thereof to Sutherland." Payment was to be made in two installments, one-half on execution of the contract and the balance on delivery of the refiner. In addition to the leasing and licensing fees, as the above payments were called, Brown agreed to pay certain percentages of the savings "for the use of the refiners * * * and for the sole and exclusive licenses, privileges and rights * * * granted." Sutherland was to furnish Brown such technical advice as would be required and the refiners were to remain the sole and exclusive property of Suthreland. The payment arrangements in this contract were similar to those in the other contracts in respect to the time of payment. Sutherland retained title for the same reasons that he retained title *55 to the machines referred to in the other contracts. The three contracts described were all made by petitioner Sutherland individually. On October 20, 1936, he assigned them to the Corporation. As a result of these three contracts the following sums of money were received by Sutherland as "leasing or licensing fees," as the payments made on execution of the contract and delivery of the machines were called: Payment Received
Date
Machine
Per contract of July 15, 1935
$ 5,000
July, 1935
Anglocan No. 3
5,000
Feb. 27, 1936
Anglocan No. 3
5,800
Mar. 6, 1936
Anglocan No. 3
Per contract of August 30, 1935
15,000
Sept. 6, 1935
Brown Nos. 1 and 2
15,000
Mar. 16, 1936
Brown Nos. 1 and 2
Per contract of March 11, 1936
12,000
Apr. 21, 1936
Brown Nos. 4 and 5
12,000
May 22, 1936
Brown Nos. 6 and 7
16,800
Aug. 14, 1936
Brown Nos. 4 and 5
16,800
Oct. 10, 1936
Brown Nos. 6 and 7
The following sums were received by the Corporation as similar "leasing or licensing fees": Payment Received
Date
Machine
Per contract of Mar. 11, 1936
$24,000
Oct. 23, 1936
Brown Nos. 8, 9, 10, 11
12,000
Dec. 15, 1936
Brown Nos. 12 and 13
17,400
Feb. 20, 1937
Brown Nos. 8 and 9
17,400
Mar. 5, 1937
Brown Nos. 10 and 11
3,480
Apr. 12, 1937
Brown Nos. 14 and 15
12,000
Apr. 13, 1937
Brown Nos. 14 and 15
18,960
June 18, 1937
Brown Nos. 12 and 13
28,299.14
Dec. 3, 1937
Brown Nos. 14 and 15
*56 The Corporation reported its income tax on fiscal years ending September 30, 1937, and September 30, 1938. For the construction of the above machines the manufacturers were paid the following amounts: Amount
Date
Machine
Manufacturer
$ 4,000
July, 1935
Anglocan No. 3
Bertram
5,000
Feb. 27, 1936
Anglocan No. 3
Bertram
5,000
Mar. 13, 1936
Anglocan No. 3
Bertram
11,490
Sept. 10, 1935
Brown Nos. 1 and 2
Thropp
11,490
Mar. 16, 1936
Brown Nos. 1 and 2
Thropp
9,600
Apr. 21, 1936
Brown Nos. 4 and 5
Thropp
9,600
May 22, 1936
Brown Nos. 6 and 7
Thropp
14,600
Aug. 14, 1936
Brown Nos. 4 and 5
Thropp
Amount
Date
Machine
Manufacturer
15,000
Oct. 13, 1936
Brown Nos. 6 and 7
Thropp
19,200
Oct. 23, 1936
Brown Nos. 8, 9, 10, 11
Thropp
9,600
Dec. 22, 1936
Brown Nos. 12 and 13
Thropp
14,900
Feb. 20, 1937
Brown Nos. 8 and 9
Thropp
14,900
Mar. 8, 1937
Brown Nos. 10 and 11
Thropp
6,000
Apr. 27, 1937
Brown Nos. 14 and 15
Thropp
16,200
June 23, 1937
Brown Nos. 12 and 13
Thropp
28,000
Dec. 3, 1937
Brown Nos. 14 and 15
Thropp
2,482.63
Dec. 7, 1937
Brown Nos. 14 and 15
Thropp
For the year 1935 Sutherland kept no books except *57 a checkbook which showed receipts and disbursements. In 1936 he hired an accountant to open books for his personal business. In November, 1936, these books were opened with entries as of January 1, 1936, based on information in the checkbook. The books did not carry the machines here in question as capital assets. Instead, where the above-mentioned sums were received, the account of Brown was credited and cash debited. When the disbursements described above were made, the account of Thropp was debited and cash credited. On delivery of a machine Brown was debited, Thropp credited, and cash debited and credited. The excess of cash debited was credited to engineering fees and at the end of the year engineering fees were debited and profit and loss credited. When the Corporation was formed the same accountant opened its books. Sutherland having assigned all his rights in the contracts in question to the corporation, the opening journal entries on the latter's books showed Sutherland debited with $100,000, capital stock credited $100,000, Sutherland credited $100,000, and "Contracts" debited with $100,000. The machines were not set up on the books of the corporation as capital assets. *58 As the amounts described above were received, a "Machine Construction Account" was credited and cash debited. As payments described above were made "Thropp" was debited and cash credited. When deliveries of machines were made "Machine Construction Account" was debited, Thropp credited, and cash debited and credited. The excess of cash debited was credited to engineering fees were debited and profit and loss credited. The machines were not treated as capital assets and no depreciation charges were made on the books. This method of accounting was used by the Corporation in both of the taxable years in question. Both petitioners used a cash method of accounting. In 1935 Sutherland included in gross income the amounts he received from Brown, but he did not include the amounts he received from Anglocan. He deducted a depreciation allowance on the refiners contracted for in that year but he did not take deductions for construction costs. In 1938 he filed a claim for refund stating that he erroneously included in gross income for 1935 $11,490 - the amount he paid to Thropp. In 1936 Sutherland did not include in gross income the sums received from Anglocan but he did include the sums received *59 from Brown. In that year he took no deductions for construction costs but did take depreciation allowances. The return was filed within the proper time. On January 4, 1938, he filed a claim for refund contending that he had erroneously included in gross income the total amounts that he had received from Borwn while he should have included only the excess of the amounts so received over the amounts paid to Thropp. The returns of the Corporation show that by its method of making tax returns it included as gross income only the excess of the amounts received under the three contracts described above, over the disbursements described. The Corporation never claimed any depreciation allowance. Its returns were in accord with the method of accounting used by it. Pursuant to the two contracts with Brown six refiners were delivered in 1936 and eight refiners were delivered in 1937. Approximately four Sutherland refiners were necessary to supply the pulp used by one paper machine operated by Brown. Brown manufactured various types and grades of paper on each machine. Only after considerable adjustments could a machine be switched from making one type of paper to another. Before any of the *60 Sutherland refiners were used by Brown it refined all of its pulp in 24 or 26 Jordan refiners. By early 1939 Sutherland refiners processed all of Brown's pulp and the Jordans had been moved out. As refiners are rather large, it would have been a very considerable task to replace the Sutherland refiners if they had not been successful. If such a changeover were made all at once, production would have been suspended for approximately one month. On February 3, 1936, Sutherland entered into a contract with Mead, the relevant terms of which are set out below. The agreement was in the form of a letter from Sutherland to Mead, in which Sutherland outlined the terms of the contract and Mead wrote its acceptance on the bottom of the letter. 1. I will supply and lease to you for one year from date of arrival at Chillicothe one single rotation refiner designed for operation on Sulphite, soda or chestnut pulps. * * * Delivery to be made within ten weeks. 2. I will supply my services in connection with this installation free of charge except payment of out of pocket expenses to and from your mills and during the period referred to in clause 1 will not conduct tests on similar pulps for book, *61 bond, sulphite waxings and chestnut liners or board for any other concern in the United States located east of the Rocky Mountains. In the event of delays arising beyond control of the Mead Corporation the leasing period in clause 1 will be extended by the same time but the exclusive features in the clause shall not apply. 3. In consideration of this lease and rights granted you will pay the sum of $15,000.00 as follows: $7,500.00 upon acceptance of this proposal and the balance upon delivery of bills of lading to you. * * * * *
5. If you do not elect to continue the use of this refiner at the end of the first year's lease I will refund the sum of $15,000.00 and you will load the refiner on to cars to my order. 6. This leased refiner remains my property at all times and you will have no right of property therein. * * * 7. In further consideration of this lease and rights conferred you agree that you will not use any refining discs in the said refiner other than those supplied by me or my nominees. Further you will not infringe or contest the validity of any of the United States Letters Patent or Patent applications pending under which this lease is granted while the said refiner *62 or any others leased to you are in your mill or mills. 8. Since it is not possible to evaluate the value of this refiner until tests have been made by you we cannot decide upon a mutually fair basis for extension of the said lease or the conditions under which additional refiners may be leased but it is the intention of both of us to work out a mutually satisfactory basis at the time, which will give Mead some preference over competitors in the grades specified. 9. I agree to defend and protect the Mead Corporation against any litigation involving the right to use the process and apparatus referred to above. The $15,000 referred to above was paid by Mead to Sutherland. The refiner referred to was manufactured by Thropp, and Thropp was paid $11,490. Sutherland's books show, on pages entitled "Cash Receipts," $7,500 received from Mead on February 24, 1936, and another $7,500 received on May 28, 1936. The sums so received were entered under a column entitled "Deposits - Mead." Sutherland's books on a page entitled "Cash Disbursements" show a payment of $5,745 for "Mead Machinery" on February 22, 1936, and on May 29 a payment to Thropp of $5,745, which is not stated in the books to *63 be payment for Mead refiner. In his income tax return for the calendar year 1936 Sutherland included no part of the $15,000 as income and took no deduction for money paid to Thropp on account of this refiner. This refiner did not give satisfaction to the Mead Corporation and as a result the machine was sold outright to Mead by the Sutherland Corporation in the taxable year 1938 for $3,000. By the terms of this sale Mead also gave up the exclusive rights they had been granted by the contract of February 3, 1936. By a contract of August 15, 1938, Mead agreed to purchase a refiner from the Corporation for $25,320 less 10 percent, or $22,788. During the taxable year ended September 30, 1938, Mead paid to the Corporation the sum of $11,394 on account of the purchase price of the refiner thus ordered, and the manufacturer of the refiner was paid the sum of $7,640.50. On November 22, 1938, this machine was delivered. Subsequent to September 30, 1938, the balance of the purchase price, $11,394, was paid by Mead to the Corporation and the balance, $7,640.50, was paid to the manufacturer. The difference between the amount actually received in the taxable year 1938 and the amount actually *64 spent in that year on account of the refiner in question was $3,753.50. In his notice of deficiency respondent asserted that the entire amounts received by Sutherland and the Corporation as a result of the contracts of July 15, 1935, August 30, 1935, March 11, 1936, and February 3, 1936, were includible in gross income with allowances made for depreciation on the refiners concerned. Petitioners contend that only the excess of the amounts received under these contracts over the cost of constructing the refiners should be included in gross income, or alternatively that the cost of the refiners should be deducted from gross income in computing net income. In his deficiency notice respondent asserted that the Corporation received taxable net income for the tax year 1938 as a result of the sale of a refiner to Mead under a contract of August 15, 1938. The Corporation contended that any net income received under that contract was taxable in the tax year 1939, rather than 1938. Opinion Since the decision in , acq. , developments involving the underlying principles *65 upon which the result in that case was reached have tended, if anything, to enhance its authority. Its analogy to the present proceeding is manifest. The payments about which the principal controversy arises here were explicitly made to defray the cost of constructing the machines to be licensed under petitioner's patent, and because of the petitioner's scarcity of funds for the purpose. It is as clear in this proceeding as it was there that that was the object to which the payments were appropriated, that the licensees expected and had a right to assume that the object would be realized, and that as in the International Cigar case: "If in this case the construction costs had been paid by the" licensees, "directly to the" manufacturers of the machines "then clearly, under the principle of the realty lease cases, they would not be income to the petitioner. The substance of the transaction is not changed by having the construction costs pass through petitioner's hands under a system whereby it did not profit from the funds." More recently, , and , *66 have clarified "the principle of the realty lease cases," and established the rule that improvements furnished by a lessee which "become and remain the property of the landlord" are not to be treated as income to the latter until repossession upon termination of the lease. And , announcing the doctrine that capital assets paid for by customers do not under the circumstances there existing justify a deduction for depreciation, even though title to the assets vests in the taxpayer, points out that while "The payments were to the customer the price of the service," nevertheless "They have not been taxed as income, presumably because it has been thought to be purchased by this Court's decisions * * *." The conclusion reached in the International Cigar case that income is properly reflected notwithstanding the failure to include payments received and applied to the acquisition of leased assets thus seems definitely to have been confirmed, if indeed such confirmation was required. As to all the years before us, both individual petitioner and petitioner corporation kept their books in accordance with this *67 principle of reporting income, except that during the earliest years the individual petitioner apparently had no system of accounting which was reflected in any set of books. We do not view this circumstance as a fundamental distinction from the International Cigar case. It may be true that if petitioners had consistently maintained a bookkeeping system radically at variance with the principles they now seek to apply, and if that system had equally reflected their true income, they should not now be permitted the benefits of a different system, at least without the respondent's approval of any change. But since the only definitive method of keeping books which has ever been used is the one which petitioners now consistently rely upon, and since, as we have seen, that is a method which can be accepted as clearly reflecting income, we think it would make for confusion and instability to require either a change in the method adopted or a distinction between the methods to be applied during the earliest year before us, and those for subsequent ones. Nor is it material that in the International Cigar case the payments in question were referred to as deposits or construction *68 costs, while here the parties used the term rentals. The substance of the two transactions being identical, we shall not be led to the correct results by looking solely to the labels under which the respective transactions were consummated. See ; . A question is raised as to the propriety of taxing an excess payment received in 1938 on account of a machine which was not completed until the following year. petitioners concede that the difference between the payments made by licensees and the cost of machines are income items. It is our view that to the extent that the cash payment in question exceeded the cash disbursement for the aliquot cost of the machine for which the payment was made, petitioners' cash system of accounting requires that the difference be included in its income for the year of receipt. The foregoing disposition leaves the parties in agreement that petitioners were not entitled to depreciation allowances in the respective years, and that respondent was in error in allowing them in his deficiency notice. This adjustment can be given *69 effect in the recomputation. For similar reasons it is unnecessary to express any opinion with respect to the proceeds of the sale of one of the machines in 1938, which respondent treated as creating a deductible loss but with a capital loss limitation. Decisions will be entered under Rule 50.